LINKS: 67, 68

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re COUNTRYWIDE FINANCIAL CORP. MORTGAGE-BACKED SECURITIES LITIGATION | Case No. 2:11-ML-02265-MRP (MANx) |
| SEALINK FUNDING LIMITED, <br> Plaintiff, <br> v. <br> COUNTRYWIDE FINANCIAL CORPORATION, et al., <br> Defendants. | Case No. 2:11-CV-08896 MRP (MANx) <br> **ORDER RE MOTIONS TO DISMISS THE AMENDED COMPLAINT** |

## I.  INTRODUCTION

This case has been transferred to the Court for pre-trial proceedings as part of Multidistrict Litigation No. 2265, captioned *In re Countrywide Financial Corp. Mortgage-Backed Securities Litigation* ("the MDL").

Plaintiff Sealink Funding Limited ("Plaintiff" or "Sealink") asserts that several non-party special purpose vehicles (the "Irish SPVs")[1] purchased

---

[1] The Irish SPVs are Ormond Quay Funding Plc., Eden Quay Asset Management Ltd., Ellis Quay Asset Management Ltd., Merchants Quay Asset Management Ltd., and Sachsen Funding I Ltd.

mortgage-backed securities based on fraudulent misrepresentations. This Order concerns the threshold issue of whether Sealink has constitutional standing to assert the claims at issue in this case. The Court is unable to resolve that issue on the present record.

## II.   BACKGROUND

In an Omnibus Order that governed several MDL cases, the Court dismissed Sealink's claims but granted leave to amend. Omnibus Order, 2012 WL 1574285, at *13. In any amended complaint, the Court ordered Sealink to explain "(i) on what basis it argues that the [Irish] SPVs assigned [Sealink] their legal rights and (ii) on what basis [Sealink] argues that the [Irish] SPVs have suffered an injury." *Id.* In its Amended Complaint, Sealink explained the relationships between the various entities as follows.

The Irish SPVs were each created by Sachsen LB Europe Plc. ("Sachsen Europe"). Amended Complaint ¶ 11. Between 2005 and 2007, the Irish SPVs purchased the approximately $1.6 billion in residential mortgage-backed securities ("RMBS") certificates[2] that are at issue in this case (the "Certificates"). *Id.* at ¶ 32. Sometime in either late 2007 or early 2008, Sachsen Europe helped establish three special purpose vehicles in the Cayman Islands (the "Cayman SPVs"). *Id.* at ¶ 36. Between January 18, 2008, and February 27, 2008, the Irish SPVs transferred RMBS, including the Certificates at issue in this case, to the Cayman SPVs.[3] *Id.* ¶

---

[2] A certificate is a document that shows ownership of a mortgage-backed security issued pursuant to a registration statement and prospectus supplement in a public offering. Each certificate represents a particular tranche within an offering. The Court uses the term "Certificate" to refer specifically to the certificates at issue in this case. An Offering refers to the process by which the Certificates were sold to Plaintiffs. The Offering Documents refer to the Registration Statements, Prospectuses and Prospectus Supplements, Term Sheets, and other written materials pursuant to which the Certificates were offered.

[3] The Amended Complaint states that Sachsen Europe "transferred RMBS from the Irish SPVs to [the Cayman SPVs]." While it might be accurate to say that Sachsen

37.  The transfers were governed by Global Master Repurchase Agreements executed between the Irish SPVs and the Cayman SPVs (the "Master Repurchase Agreements"). *Id.* ¶ 38.  The Master Repurchase Agreements conveyed "all right, title and interest" in the Certificates to the Cayman SPVs. *Id.*  The transfers from the Irish SPVs to the Cayman SPVs were conducted at par value, allegedly to "avoid[] recognition and consolidation of the massive underlying losses that the RMBS had already sustained." *Id.*

At some later date, the Cayman SPVs transferred the Certificates to Sealink. *Id.* ¶ 39.  That transfer was again conducted at par value, allegedly to "allow[] the RMBS to be transferred without recognition and consolidation of the massive underlying losses that the portfolios had already sustained." *Id.*  The transfer between the Cayman SPVs and Sealink was governed by a series of Sale and Purchase Agreements (the "SPAs") and a Master Framework and Definitions Schedule (the "Master Framework"). *Id.*  The Master Framework provides that "[a]ny reference in the Transaction Documents to . . . 'assets' includes present and future properties, revenues and rights of every description." *Id.*

### III.   LEGAL STANDARD

Standing is an "irreducible constitutional minimum" that must exist for federal jurisdiction to attach. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  Even if not raised by the parties, "'[f]ederal courts are *required* sua sponte to examine jurisdictional issues such as standing.'" *Bernhardt v. County of Los Angeles*, 279 F.3d 862, 868 (9th Cir.2001) (internal citation omitted) (emphasis added); *see also* Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").  "To satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered

---

Europe *directed* the transfer, the Irish SPVs are the entities that owned the Certificates at issue.  The Irish SPVs, therefore, are the entities that would have transferred the Certificates to the Cayman SPVs.

an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). Because these elements are "not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561 (1992).

When evaluating a plaintiff's standing, a district court must generally "accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth v. Seldin*, 422 U.S. 490, 501 (1975). However, a trial court may "allow or to require the plaintiff to supply, by amendment to the complaint or by affidavits, further particularized allegations of fact deemed supportive of plaintiff's standing. If, after this opportunity, the plaintiff's standing does not adequately appear from all materials of record, the complaint must be dismissed." *Id.* at 501–502.

### IV.   DISCUSSION

In the Omnibus Order, the Court ordered Sealink to address both whether the Irish SPVs' claims have been assigned to Sealink and whether the Irish SPVs had suffered an injury. 2012 WL 1574285, at *13.[4] Defendants do not challenge the assignment on this motion; rather they argue that the Irish SPVs were made entirely whole when they sold the Certificates for par value. Defendants argue that the Irish SPVs therefore did not have standing to pursue the claims in this case;

---

[4] The Court uses the terms "assignment" and "injury" as shorthand for these two issues.

4

they continue that any assignment inquiry is moot because there was no claim for the Irish SPVs to assign.

Sealink's argument rests on the premise that causes of action based on tortious misrepresentations are property rights, assignable like any other.[5] The Court accepts that premise solely for purposes of this motion and subject to the caveats discussed in footnote 5. If a cause of action for tortious misrepresentation is freely assignable, it cannot be the case that accepting payment for that cause of action could reduce recoverable damages or destroy standing by making the assignor whole. Such a rule makes no conceptual sense,[6] and would provide a strong disincentive to the assignment of claims. The Court must consider the facts of the case against this conceptual background.

According to Sealink, the Irish SPVs sold both the Certificates and the causes of action asserted here to the Cayman SPVs in the same series of transactions. If that is correct, then it follows that some portion of the transaction price was in consideration of the causes of action and the remainder of the transaction price (an amount that is, by definition, less than the transaction price,

---

[5] The Court agrees that such a cause of action is assignable, in principle and under American law. However, at least some of the transaction documents in this case contain British choice-of-law provisions. The Court expresses no view at this stage on whether similar provisions exist in all of the transaction documents for this case, whether any such provisions govern the assignment questions, whether misrepresentation-based claims are assignable under British law, or whether the transaction documents in this case effected an assignment of the specific causes of action asserted in this case. Those questions must be answered before this case continues, but they have not been briefed and the record is insufficient for the Court to answer them *sua sponte*. The Court therefore reserves them for determination at a later date.

[6] The difficulty in trying to value a claim for assignment under such a rule makes this point clear. An ideal claim with 100% expected recovery and a fee-shifting provision should be salable for an amount equal to (or very near) the amount of damage suffered. But if recouping that amount renders the assignor whole and destroys standing, no assignee would be willing to purchase such a claim.

1  i.e. par) was in consideration of the Certificates themselves.  Again, an amount
2  paid in consideration of a cause of action cannot make an assignor whole or to
3  destroy constitutional standing.  If the transactions between the Irish SPVs and the
4  Cayman SPVs included an assignment, it follows that the Irish SPVs received less
5  than par value in the portions of those transactions that transferred the Certificates.
6  If correct, then the Irish SPVs were not made whole by those portions of the
7  transactions, and they may have had standing to assign to the Cayman SPVs for
8  later assignment to Sealink.  If, on the other hand, the transactions did not include
9  assignments of causes of action, then the Irish SPVs may have been made whole
10 and injury in fact defeated, as Defendants argue.  But in that case, Sealink would
11 not be the proper plaintiff and so there would be no need to reach the relatively
12 complex question of constitutional injury in fact.

## V. CONCLUSION

For the reasons discussed above, Sealink's standing to pursue the claims in this case will rise or fall with the assignment issue.  As discussed above, the Court has a constitutional duty to assure itself of Sealink's standing before proceeding with the case.  In order to assure itself that Sealink has standing to pursue the claims it asserts in this case, the Court finds that it must determine whether the Irish SPVs assigned the causes of actions asserted here to the Cayman SPVs and whether the Cayman SPVs in turn assigned those causes of action to Sealink.  The Court is unable to make these determinations on the present record.  Accordingly, the Court orders that within 21 days of this Order Sealink must file the complete set of transaction documents for every transaction pursuant to which Sealink alleges that any party transferred or assigned any of the causes of action asserted in this case.  Sealink must also include a declaration identifying the relevant portions

of the transaction documents and identifying the legal authority under which Sealink argues that those transaction documents effected an assignment of claims.[7]

Within 21 days of this Order, the parties shall also submit a Joint Status Report addressing whether further briefing is required and proposing an expeditious schedule for any such briefing.

**IT IS SO ORDERED.**

DATED:  June  15, 2012      _____

Hon. Mariana R. Pfaelzer

United States District Judge

---

[7] As part of the original motion to dismiss briefing, Sealink filed the Declaration of Susan Millar.  ECF No. 47-3 ("Millar Decl.").  The Millar Declaration cites the definition of "assets" in the SPAs and the Master Framework (Millar Decl. ¶¶ 12–13) and then states that, when read together under English law, the definitions "make[] it clear that the SPAs transfer all rights of the SPVs relating to the RMBS Assets, without limitation, to Sealink."  Millar Decl. ¶ 15.  This conclusion is not at all clear from the language of the documents, and Ms. Millar cites no legal authority.  Sealink is hereby warned that a similarly bare and conclusory declaration at this juncture would not allow the Court to satisfy itself that jurisdiction exists and would therefore warrant dismissal.

7