Brian E. Pastuszenski (*pro hac vice*)
bpastuszenski@goodwinprocter.com
John J. Falvey (*pro hac vice*)
jfalvey@goodwinprocter.com
Adam Slutsky (*pro hac vice*)
aslutsky@goodwinprocter.com
**GOODWIN PROCTER LLP**
Exchange Place
Boston, MA 02109-2802
Tel.:  617-570-1000
Fax:  617-570-1231

Lloyd Winawer (SBN 157823)
lwinawer@goodwinprocter.com
**GOODWIN PROCTER LLP**
601 South Figueroa Street, 41st Floor
Los Angeles, California 90017
Tel.:  213-426-2500
Fax:  213-623-1673

*Attorneys for Defendants*
Countrywide Financial Corporation, Countrywide Home Loans, Inc., CWALT, Inc., CWABS, Inc., CWHEQ, Inc., and Countrywide Securities Corporation

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN re COUNTRYWIDE FINANCIAL CORP. MORTGAGE-BACKED SECURITIES LITIGATION CASES | Case No.  11-ML-02265-MRP (MANx)<br>**REPLY IN FURTHER SUPPORT OF THE COUNTRYWIDE DEFENDANTS' MOTION TO DISMISS SEALINK'S AMENDED COMPLAINT** |
| SEALINK FUNDING LIMITED,<br><br>Plaintiff,<br><br>v.<br><br>COUNTRYWIDE FINANCIAL CORPORATION, *et al.*,<br><br>Defendants. | Case No.  11-CV-08896-MRP (MANx)<br><br>Date/Time:  September 11, 2012, 11:00 a.m.<br>Courtroom:  12<br>Judge:       Hon. Mariana R. Pfaelzer |

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................................ 1

ARGUMENT .............................................................................................................. 4

    I.    SEALINK HAS NO RIGHT TO SUE BECAUSE THE TRANSACTION DOCUMENTS DO NOT REFERENCE ANYTHING RELATING TO THAT RIGHT. .................................... 4

        A.    The SPAs Transferred Only The Underlying Assets. ................ 4

        B.    The Framework Agreement Does Not Reference Legal Claims, Damages, Or Anything Relating To The Right To Sue ................................................................................................. 5

    II.    SEALINK'S CLAIMS ARE ALSO BARRED BY OTHER REQUIREMENTS OF ENGLISH LAW. ........................................... 10

CONCLUSION ........................................................................................................ 13

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Batey v. Jewson Ltd*,
    [2008] EWCA Civ 18 ....................................................................................... 6, 7, 9

*Brownton Ltd v. Edward Moore Inbucon Ltd*,
    [1985] 3 All E.R. ................................................................................................. 13

*Chartbrook Ltd v. Persimmon Homes Ltd*,
    [2009] AC 1101 ..................................................................................................... 9

*Compania Colombiana de Seguros v. Pacific Steam Navigation Co.*,
    [1965] 1 QB 101 .................................................................................................. 11

*Denney, Gasquet and Metcalfe v. Conklin*,
    [1913] 3 KB 177 .................................................................................................. 11

*Gatoil Anstalt v. Omenial Ltd*,
    [1980] 2 Lloyd's Rep. 489 .................................................................................. 11

*Gorringe v. Irwill India Rubber*,
    [1886] 34 Ch D 128 .............................................................................................. 6

*Hendry v. Chartsearch Ltd*,
    [1998] CLC 1382 ................................................................................................. 11

*In re Gunsbourg*,
    [1919] LJKB 479 ................................................................................................... 6

*Jackson v. Dear*,
    [2012] EWHC 2060 ........................................................................................ 8, 10

*Kapoor v. National Westminster Bank plc*,
    [2011] EWCA Civ 1083 ..................................................................................... 12

*M.H. Smith (Plant Hire) Ltd v. Mainwaring*,
    [1986] 2 BCC 99262 ........................................................................................... 12

*Maridive & Oil Servs. (SAE) v. CAN Ins. Co. (Europe) Ltd*,
    [2002] 1 All ER ................................................................................................... 11

*Massai Aviation Servs. v. Attorney General*,
    [2007] UKPC 12 .................................................................................................... 13

*Paratus AMC Ltd v. Countrywide Surveyors Ltd*,
    [2011] EWHC 3307 ............................................................................................... 11

*Percival v. Dunn*,
    [1885] 29 Ch. D. 128 ........................................................................................... 5, 6

*Raiffeisen Zentralbank Osterreich AG v. Five Star Trading LLC*,
    [2001] QB 825 ....................................................................................................... 12

*Rainy Sky SA v. Kookmin Bank*,
    [2011] UKSC 50 ...................................................................................................... 8

*Sealink Funding Ltd. v. Countrywide Fin. Corp.*,
    No. 11-cv-08896-MRP, 2012 WL 2250138 (C.D. Cal. June 15, 2012) ........ 2, 13

*Tailby v. Official Receiver*,
    [1888] 13 App Cas 523 .................................................................................. 1, 6, 7

*Tinseltime Ltd v. Roberts*,
    [2011] EWHC 1199) ............................................................................................. 13

*Trendtex Trading Corp. v. Credit Suisse*,
    [1982] A.C. 679 ..................................................................................................... 13

*United Trust Bank Ltd v. Dohil*,
    [2011] EWHC 3302 ............................................................................................... 11

*Van Lynn Devs. Ltd v. Pelias Constr. Co.*,
    [1969] 1 QB 607 .................................................................................................... 11

*Warth v. Seldin*,
    422 U.S. 490 (1975) .............................................................................................. 13

*Watson v. Duke of Wellington*,
    [1830] 1 Russ & MY 692 ....................................................................................... 6

**OTHER AUTHORITY**

Butterworths Common Law Series, *The Law of Contract*
    (Andrew Grubb ed., 4th ed. 2011) ....................................................................... 12

The Countrywide Defendants[1] respectfully submit this reply memorandum in further support of their motion to dismiss the Amended Complaint.

## PRELIMINARY STATEMENT

In its Opposition, Sealink concedes that an English court has never found a valid assignment of legal claims absent, in this Court's words, an "express provision that says that you've got the right to sue."[2] Sealink nonetheless argues that this Court should do what no English court has done and find a valid assignment here even though the relevant agreement lacks such an "express provision." There is no basis in English law for this Court to do so, however, and the Court should dismiss this suit for lack of standing.

As Sealink's own cases demonstrate, English courts will enforce an assignment of property or a legal right where the property or legal right "shall answer the description in the assignment, or, in other words, that it shall be capable of being identified as the thing, or one of the very things assigned."[3] Here, the SPVs and Sealink entered into SPAs that precisely identified the assets being assigned as "each Asset" listed in the schedule of assets (Schedule 1) attached to the SPAs. The SPAs did not identify the right to sue as "one of the very things assigned."

But Sealink now argues that "Asset" (uppercase) also means "rights of every description" because a separate "framework" agreement uses that phrase to describe the term "assets" (lowercase) when the word "assets" appears in so-called

---

[1] This reply memorandum refers to the same defined terms as the original memorandum, and also refers to (i) Plaintiff's Opposition to Defendants' Motion to Dismiss the Amended Complaint as the "Opposition" or "Opp."; (ii) the Rebuttal Declaration of Andrew Onslow QC as the "Onslow Rebuttal Declaration" or "Onslow Reb. Decl."; (iii) the Memorandum in Support of the Countrywide Defendants' Motion to Dismiss Sealink's Amended Complaint as the "Defs.' Memo."; and (iv) the Reply Declaration of Stephen Auld QC in Further Support of the Countrywide Defendants' Motion to Dismiss as the "Auld Reply Decl."

[2] *Sealink Funding Ltd. v. Countrywide Fin. Corp.*, Hearing Tr. at 7:22-25 (C.D. Cal. Feb. 14, 2012) (RJN Ex. 1).

[3] Onslow Reb. Decl. ¶ 7(v) Ex. 29 at 433 (citing *Tailby v. Official Receiver* [1888] 13 App Cas 523 (HL)).

REPLY IN FURTHER SUPPORT OF THE COUNTRYWIDE DEFENDANTS' MOTION TO DISMISS

1

"Transaction Documents."  Even though the Court required it to produce "the complete set of transaction documents" by July 6, 2012, *Sealink Funding Ltd. v. Countrywide Fin. Corp.*, No. 11-cv-08896-MRP, 2012 WL 2250138 at *3 (C.D. Cal. June 15, 2012),   Sealink filed with its Opposition yet another document (the "Loan Agreement") that appears to classify the SPAs as one of these "Transaction Documents."[4]  Although the SPAs may be one of the "Transaction Documents," Sealink's submission of the Loan Agreement to connect the dots between the SPAs and the framework agreement is futile for two reasons.

First, the Loan Agreement confirms that the SPAs' definition of "Asset" still controls.  More specifically, this agreement lists the SPAs as among the "Underlying Assets Sale and related documents," and the framework agreement in turn defines "Underlying Assets" as "each Asset *as defined in each Sale and Purchase Agreement*." (Emphasis added.)  Thus, the plain language of the SPAs and the framework agreement shows that Sealink was assigned only "each Asset" (*i.e.*, the certificates) and nothing more.

Second, even if the plain language of the framework agreement could be read to import the reference to "rights of every description" into the SPAs (which it cannot, at least not without ignoring what the words actually say), this would still not suffice to assign the right to sue to Sealink in addition to the certificates themselves.  Indeed, the phrase "rights of every description" does not identify the right to sue, any legal claims, or the right to seek damages.  This language contrasts starkly with the agreements that some of the SPVs entered into in an earlier phase of the same transactions that *did* explicitly identify a certain unrelated right to sue as one of the assets being assigned—the SPVs knew how to comply with English law

---

[4] The framework agreement defines "English Law Transaction Documents" as, among other things, "each of the documents set out in items 1 to 12 and item 22 in Schedule 1 (*Conditions Precedent*) of the Loan Agreement."  Onslow Decl. ¶ 46(vi) Annex B, Ex. 20 at 597.  The Loan Agreement lists under item 22 "Sale and Purchase Agreement in relation to each of the Relevant Sellers" (*i.e.*, the Irish SPVs and Cayman SPVs).  DeLange Decl. ¶ 2.B Ex. B at 645.

REPLY IN FURTHER SUPPORT OF THE COUNTRYWIDE DEFENDANTS' MOTION TO DISMISS

2

when in fact they intended there to be an assignment of legal claims. Here, however, the English cases do not permit a court to rewrite the contract or "imply" into the SPAs' assignment provisions the right to sue because those provisions (even if modified by the language in the framework agreement) do not identify anything relating to the right to sue or enforce legal claims associated with the purchase of the certificates. And Sealink has not identified a single case where an English court did imply such an assignment of legal rights in circumstances like these here.

Nor has Sealink satisfied the requirements in the English case law for an effective "legal" or an "equitable" assignment, without which there can be no assignment under English law. Notwithstanding Sealink's characterization of those requirements as outdated and "procedural," Sealink cites no English cases that have eliminated them. To the contrary, courts (including those that the Opposition and the Onslow Rebuttal Declaration cite) continue to require (i) *pre-action* notice of the assignment in writing to the debtor (for a valid legal assignment), (ii) joinder of all parties potentially entitled to damages (for a valid equitable assignment), and (iii) a would-be assignee's *pre-existing* legitimate commercial interest in the legal claims (for a valid equitable assignment). Here, however, Sealink satisfied none of these requirements: it did not give notice before filing this litigation, did not join any other parties to the litigation, and did not have a pre-existing commercial interest in the MBS at issue by virtue of its role as the current holder of those MBS.

Because Sealink never was assigned the legal claims in question, this action should be dismissed with prejudice for lack of standing.

REPLY IN FURTHER SUPPORT OF THE COUNTRYWIDE DEFENDANTS' MOTION TO DISMISS

3

# ARGUMENT

## I. SEALINK HAS NO RIGHT TO SUE BECAUSE THE TRANSACTION DOCUMENTS DO NOT REFERENCE ANYTHING RELATING TO THAT RIGHT.

### A. The SPAs Transferred Only The Underlying Assets.

Sealink does not dispute that the plain language of the Phase III SPAs—the only agreements to which Sealink is a party—assigns only "each Asset," which "means each of the assets listed in Schedule 1" "unless the context otherwise requires." *See, e.g.*, Onslow Decl. ¶ 46(vi) Annex B, Ex. 15 at 500-01. Nor does Sealink dispute that "Schedule 1" lists only the CUSIPs or that the "context" does not require reference to any definition or interpretation beyond the SPAs. Indeed, the SPAs' definition of "Asset" as "the slices, the bonds"[5] makes logical sense in the context of Sealink's nominal role as a "'bad bank' [created] to isolate and hold the toxic assets." Opp. at 6.

In order to argue that legal rights in fact were assigned despite the SPAs' plain language, Sealink goes outside the SPAs and looks to two other documents in an effort to incorporate the phrase "rights of every description" into the definition of "Asset." According to Sealink, the June 7, 2008 Master Framework and Definitions Schedule construes the term "assets" (lowercase) in certain "Transaction Documents" (*e.g.*, "English Law Transaction Documents") to include "rights of every description." *Id.* at 10. Sealink contends that the term "English Law Transaction Documents" includes the SPAs based on a June 7, 2008 "Loan Agreement" that Sealink previously had not filed with the Court. This "new" Loan Agreement lists (i) the SPAs under the title "Underlying Assets Sale and related documents" as well as (ii) a variety of other documents that Sealink has not filed here, including "corporate documentation" for the Irish SPVs, Cayman SPVs, and Sealink, along with a "legal opinion" relating to the Cayman SPVs' "transfer of

---

[5] *Sealink*, Hearing Tr. at 5:10 (RJN Ex. 1).

assets" to Sealink.  DeLange Decl. ¶ 2.B Ex. B at 645-47.  Sealink's latest filing therefore confirms that the SPAs effected the sale of "Underlying Assets," which the framework agreement defines as "each Asset *as defined in each Sale and Purchase Agreement*."  (Emphasis added.)  *See* Onslow Decl. Annex A, Ex. 20 at 643.  Thus, even overlaying the framework agreement on top of the SPAs, it is clear that what Sealink was assigned was "each Asset" —*i.e.*, the "slices" and "bonds" described above.  If the SPVs transferred and Sealink received additional specific rights beyond the "Underlying Assets," those rights presumably would be referenced in the "related documents" that Sealink conspicuously has not filed with the Court.  Instead, Sealink has filed only a framework agreement that references general "rights of every description," which is insufficient to assign causes of action under English law for the reasons described below.

### B. The Framework Agreement Does Not Reference Legal Claims, Damages, Or Anything Relating To The Right To Sue.

No English court has permitted the assignment of legal claims based on a general phrase like "rights of every description," or for that matter the assignment of *any* specific subject matter based on general language that does not identify that subject matter.  Sealink does not dispute this.  To the contrary, the Onslow Rebuttal Declaration cites several English cases[6] in which the assignment's validity turned on whether the relevant language identified with particularity the subject matter of the parties' dispute in litigation.

For example, in *Percival v. Dunn* (cited in the Onslow Rebuttal Declaration at paragraph 7(v), Ex. 24 at 335), the court found that an assignment was invalid where the relevant language was general and lacked "words referring to a particular fund

---

[6] Sealink ironically cites many cases from the nineteenth and early-twentieth centuries while simultaneously arguing that "much of" Defendants' authority "reflects outdated case law." Opp. at 12. In any event, all these cases (regardless of their vintage) confirm that for a valid assignment English courts require express reference to the subject matter assigned.  *See infra* at 6-7.

due." [1885] 29 Ch. D. 128 ("There is nothing . . . to the effect that the sums mentioned were to be paid out of a fund for which [the debtor] was answerable, or which he was under any obligation to pay."). The court in *In re Gunsbourg* (also cited at paragraph 7(v) of the Onslow Rebuttal Declaration, Ex. 16 at 230) reached the same conclusion, following *Percival* and holding that "the assignment, in order to be good, must specify the fund out of which the money is to come."[7] [1919] LJKB 479 (CA). There, the court emphasized that "it must be made clear that there is a subject matter to be assigned." *Id.* (Onslow Reb. Decl. Ex. 16 at 232).

Sealink's own cases also confirm that assignments are valid only where the relevant language is specific and the subject matter at issue in the litigation "shall answer the description in the assignment, or, in other words, that it shall be capable of being identified as the thing, or one of the very things assigned." Onslow Reb. Decl. ¶ 7(v) Ex. 29 at 433 (citing *Tailby*, 13 App Cas 523) (enforcing assignment of "future book debts" because relevant language identified "all the book debts due and owing"). If the subject matter is sufficiently identified, the precise "form of words is immaterial." *Id.* ¶ 7(ii) Ex. 15 at 225 (citing *Gorringe v. Irwill India Rubber* [1886] 34 Ch D 128 at 134) (finding particular words immaterial "so long as they sh[o]w an intention that [assignee] is to have such benefit").[8]

Applying these well-established principles, English courts have permitted the assignment of causes of action in cases involving explicit contract language like "the right to claim the cost of the damages," "all claims and legal rights of action," and "any sums of money recoverable from the dispute." Defs.' Memo. at 10-11 (citing English cases enforcing assignments of causes of action). The right to sue could be

---

[7] *Accord* Auld Decl. ¶ 17 (citing *Watson v. Duke of Wellington* [1830] 1 Russ & MY 602 at 605) ("[I]n order to constitute an equitable assignment there must be an engagement to pay out of the particular fund."); Auld Reply Decl. ¶ 5.

[8] *Accord* Opp. at 13 (quoting *Batey v. Jewson Ltd* [2008] EWCA Civ 18) ("The law does not require an assignment to be in any particular form. All that is required is a 'sufficient expression of an intention to assign' . . . 'The language is immaterial if the meaning is plain.'").

REPLY IN FURTHER SUPPORT OF THE COUNTRYWIDE DEFENDANTS' MOTION TO DISMISS

6

"identified as the thing, or one of the very things assigned." Onslow Reb. Decl. Ex. 29 at 433 (citing *Tailby*, 13 App Cas 523). Here, the language in the Phase I SLA agreements likewise expressly identified the right to sue as "one of the very things assigned," and Sealink concedes that the Phase I language "more obviously assigns the Countrywide causes of action."[9] Opp. at 13. In contrast, however, the language of the Phase II and Phase III agreements does not expressly assign the causes of action that Sealink asserts here.[10] This does not merely make it less "obvious" that the Phase II and Phase III language transferred the right to sue, as Sealink concedes—rather, under the English cases neither the Phase II nor Phase III agreements sufficiently transferred the right to sue.

Just as it attempted to go outside the plain language of the SPAs to try to import language from the framework agreement, Sealink again goes outside the agreements' plain language in order to argue for an "interpretation" of the language that would turn English case law on its head. According to Sealink, "the more reasonable interpretation" of the contractual assignment language "is that the fraud claims at issue should be included unless the parties expressly stated that they wished them excluded." Opp. at 14 (emphasis omitted). Not surprisingly, Sealink does not cite a single English court that has interpreted any agreement in this

---

[9] The SLAs assigned "the benefit of all powers of and remedies for enforcing or protecting such person's right, title, interest and benefit . . ., including *the right to demand, sue for, recover*, receive and give receipts for proceeds of and amounts due under or in respect of or relating to such Right or its Ancillary Rights." Onslow Decl. ¶ 43(v) Annex B, Ex. 2 at 140-41 (emphasis added).

[10] The Court should disregard Sealink's straw-man argument that agreements need not use the exact words "litigation claims," "right to sue," "claims," or "litigation" to validly assign causes of action. Opp. at 12-13. The Countrywide Defendants agree that the parties to the Phase II and Phase III agreements were not required to use these exact words or any other particular "magic language" to effect a valid assignment. But they *were* required to—and did not—use at least *some* express language to sufficiently identify the right to sue as one of the rights assigned. *See, e.g.*, Opp. at 13 (citing *Batey v. Jewson Ltd* [2008] EWCA Civ 18) (permitting assignment of legal claims where assignor did not refer to "claims" or the "right to sue" but expressly transferred the right to collect "any sums of money recoverable from the dispute"—*i.e.*, the proceeds of any claim).

REPLY IN FURTHER SUPPORT OF THE COUNTRYWIDE DEFENDANTS' MOTION TO DISMISS

7

manner.[11]

Instead, Sealink resorts to what it claims is a contractual interpretation based on the "surrounding commercial context," relying solely on a case in which the court's analysis rested on "a choice between 'more than one interpretation.'" Onslow Reb. Decl. ¶¶ 11-12 Ex. 27 at 400, 409 (quoting *Rainy Sky SA v. Kookmin Bank* [2011] UKSC 50). That court turned to "surrounding commercial context," however, only because the phrase "such sums" reasonably could have referred to the sums in two different clauses in the contract. Contrary to Sealink's characterization of this case, what the court actually said is that an English court facing clear contract language would not "rewrite the language which the parties have used in order to make the contract conform to business common sense." *Id.* Ex. 27 at 406 (citing *Rainy Sky*, UKSC 50) (internal quotations omitted); Auld Reply Decl. ¶ 10.[12] In other words, there is nothing in English law that would permit a court to read an ambiguity into a contract where none exists, or to use that "ambiguity" as a basis for considering "commercial context" to rewrite the contract. *See* Onslow Reb. Decl. ¶¶ 11-12 Ex. 27 at 405 (citing *Rainy Sky*, UKSC 50) ("Where the parties have used unambiguous language, the court must apply it.").

Indeed, as the Onslow Declaration itself explains, "where the words of a contract are clear, the court must give effect to them even if they have no discernible

---

[11] Sealink's only basis for this proposition is the unsupported argument found in the Onslow Rebuttal Declaration "that the absence of explicit reference is readily explicable by the parties regarding it as unnecessary and/or simply not foreseeing that the words would be subject to forensic analysis of the kind now applied." Onslow Reb. Decl. ¶ 13. Even if this statement were based on anything other than hindsight speculation, the Onslow Rebuttal Declaration *cites no English law* that would excuse the parties' failure to expressly refer to an assigned right based on the assumption that the parties could remain silent about that right because they did not "foresee" its significance.

[12] *Accord* Onslow Reb. Decl. ¶ 16(ii) Ex. 19 at 263 (citing *Jackson v. Dear* [2012] EWHC 2060 (Ch) ("The dictates of common sense may enable the court to choose between alternative interpretations . . . [b]ut this does not elevate commercial common sense into an overriding criterion, still less does it subject the parties to the individual judge's own notions of what might have been the most sensible solution to the parties' conundrum.")).

REPLY IN FURTHER SUPPORT OF THE COUNTRYWIDE DEFENDANTS' MOTION TO DISMISS

8

commercial purpose." Onslow Decl. ¶ 35.[13] Here, the SPAs are not subject to multiple interpretations because their express language explicitly conveys each MBS "Asset" to Sealink (and just as clearly does not convey the right to assert legal claims). Thus, Sealink's attempted rewriting of the SPAs' assignment language under the guise of "business common sense" (Opp. at 11) is impermissible under English law.

Nor does Sealink's "business common sense" (even if relevant here, which it is not) objectively make any sense at all. Sealink's own authorities confirm "the general rule . . . that evidence of negotiations leading up to a contract and of the parties' subjective intentions is not admissible for the purpose of construing the contract." Onslow Reb. Decl. ¶ 14(iii) Ex. 6 at 102-03 (citing *Chartbrook Ltd v. Persimmon Homes Ltd* [2009] AC 1101) (considering surrounding circumstances because the disputed provision was "badly drafted"); *id.* ¶ 14(ii) n.3 Ex. 2 at 49-50 (citing *Batey*, EWCA Civ. 18 ¶ 27) (considering "objective" or "ascertainable" facts to interpret phrase "any sums of money recoverable from the dispute"). But Sealink's argument here is premised on such subjective intention,[14] which if

---

[13] *See also* Defs.' Memo. at 12 (citing courts that "attribute the true meaning to the language in which the parties themselves have expressed their contract," because "the primary source for understanding what the parties meant is their language interpreted in accordance with conventional usage").

[14] *See* Defs.' Memo. at 12 n.12. Sealink's Opposition repeats the Onslow Declaration's and Petersen Declaration's subjective hindsight. First, Sealink argues that "the transfers were executed at par value despite the fact that their market prices were significantly below par" and "transferors receiving par value, when the assets were already known to be distressed, is inconsistent with the transferors retaining causes of action to recoup the depleted value." Opp. at 12. No objective facts support this speculation. To the contrary, the SPAs plainly state that "the sale of each Asset is *not being made below fair market value*." *See, e.g.*, Onslow Decl. Annex B, Ex. 15 at 504 (emphasis added). Second, Sealink's speculation that "it was recognized from the beginning that the Irish SPVs (and the Cayman SPVs after them) would be dissolved upon the completion of the transfers" (Opp. at 12) likewise does not trump the SPAs' plain language that the parties "ha[ve] *not* taken any corporate action *nor have any other steps been taken* or legal proceedings been started . . . for its winding-up, dissolution, administration, examinership or re-organisation or for the appointment of a liquidator, receiver, administrator, examiner, administrative receiver, trustee or similar officer of it or of any or all of its assets or revenues." *See, e.g.*, Onslow Decl. Annex B, Ex. 17 at 547 (emphasis added); *see also id.* at 539 ("The Seller hereby warrants to, and undertakes with, the

considered would contradict the objective meaning of the parties' agreements to transfer each "Asset" without any reference to the right to sue. Those same parties knew how to—and did in Phase I—use express language to transfer the right to sue, and the English cases will not support the conclusion here that any right to sue was validly assigned in Phase II or Phase III, and will not otherwise "imply" it into the agreements. *See* Onslow Reb. Decl. ¶ 16(ii) Ex. 19 at 262 (citing *Jackson*, EWHC [2012] 2060) (noting that implying terms could be appropriate where there are ambiguous "express terms"); Auld Reply Decl. ¶ 10.

## II. SEALINK'S CLAIMS ARE ALSO BARRED BY OTHER REQUIREMENTS OF ENGLISH LAW.

Sealink does not dispute that there are requirements under English law to establish "legal" and "equitable" assignments. It instead tries to run from those requirements by labeling them "procedural" and arguing that English law is not as strict as it once was. *See* Opp. at 2, 17. "Procedural" or not, the requirements continue to exist today and continue to be enforced by English courts, which would likewise enforce them here to bar Sealink's claims. *See* Auld Reply Decl. ¶¶ 11-20.

*First*, Sealink acknowledges that the Property Act's plain language requires "express notice in writing . . . to the debtor" for a valid legal assignment, and concedes that it did not provide notice until months after filing its original Complaint in September 2011—*i.e.*, when it filed in January 2012 its opposition to Defendants' first motion to dismiss. Opp. at 18. Sealink argues, however, that "pre-action" notice is unnecessary, supposedly because "English courts now hold that any

---

Purchaser that it is entering into this Agreement in good faith, on arm's length terms and for the purpose of *carrying on its business* . . . .") (emphasis added). While the "completion of the transfers" occurred in June 2008, the SPVs did not dissolve until late 2009. *See id.* Annex B, Ex. 22-23. Moreover, the Petersen Declaration's statement that "[n]o assets or liabilities were to be left in the Irish or Cayman SPVs following the transfer of the portfolio" (Petersen Decl. ¶ 9) flatly contradicts the SPAs' representations that the SPVs' "assets are, and will continue to be as a consequence of the transaction, greater than its liabilities . . . ." *See, e.g.*, Onslow Decl. Annex B, Ex. 15 at 502.

REPLY IN FURTHER SUPPORT OF THE COUNTRYWIDE DEFENDANTS' MOTION TO DISMISS

10

initial defect in title to sue for lack of notice prior to the start of litigation can be retroactively cured after the action is commenced." *Id.* This misstates current law. In fact, just last year, in 2011, the court in the *Paratus* case held that "legal proceedings cannot themselves constitute notice for the purpose of those proceedings," Auld Decl. ¶ 25 Ex. B-22 ¶ 62 (quoting *Paratus AMC Ltd v. Countrywide Surveyors Ltd* [2011] EWHC 3307 (Ch)), consistent with the longstanding requirement of "*[a]ntecedent* notice to the debtor *before* [an] action [is] brought." Auld Decl. ¶ 24 Ex. B-13 at 129 (quoting *Compania Colombiana de Seguros v. Pacific Steam Navigation Co.* [1965] 1 QB 101) (emphasis added). Nor do Sealink's cases (all from before the *Paratus* decision in 2011) support this argument. Rather, they either similarly permitted *pre-action* notice under the Property Act (or its predecessor act),[15] or do not involve notice under the Property Act at all.[16] In short, Sealink's failure to provide pre-action notice to the Defendants precludes a valid legal assignment under the Property Act.

*Second*, Sealink asks the Court to dispense with the "rule of practice that the assignor should be joined," arguing that the assignor SPVs have dissolved and speculating that Defendants, therefore, are "not exposed to double recovery." Opp. at 19-20 (internal quotations omitted). But English courts have "rarely departed from" the joinder requirement and only in "special circumstances." Auld Reply

---

[15] *See* Onslow Reb. Decl. Ex. 33 at 526 (citing *Van Lynn Devs. Ltd v. Pelias Constr. Co.* [1969] 1 QB 607 (CA) (pre-action notice on June 27, 1968 gave plaintiffs "good cause of action on the date they issued the writ in this action, namely, on July 1, 1968")); *id.* Ex. 8 at 147 (citing *Denney, Gasquet and Metcalfe v. Conklin* [1913] 3 KB 177) (pre-action notice in April 1908 sufficient for assignment as to subsequent litigation)); *see also id.* Ex. 13 at 195-96 (citing *Gatoil Anstalt v. Omenial Ltd* [1980] 2 Lloyd's Rep. 489) ("[T]he proviso . . . does not amount to notice of assignment to the plaintiffs as is required to validate an assignment under [the Property Act].")).

[16] *See* Onslow Reb. Decl. Ex. 17 at 241 (citing *Hendry v. Chartsearch Ltd* [1998] CLC 1382 (CA) (permitting post-action amendment to add new cause of action); *id.* Ex. 21 at 310 (*Maridive & Oil Servs. (SAE) v. CAN Ins. Co. (Europe) Ltd* [2002] 1 All ER (Comm) 653 (CA)) (same); *id.* Ex. 32 (*United Trust Bank Ltd v. Dohil* [2011] EWHC 3302 (QB)) (same).

Decl. ¶ 15 (quoting Butterworths Common Law Series, *The Law of Contract* ¶ 6.273 (Andrew Grubb ed., 4th ed. 2011)); *see, e.g.*, Onslow Reb. Decl. ¶ 23 Ex. 20 at 282 (citing *Kapoor v. National Westminster Bank plc* [2011] EWCA Civ 1083 (waiving joinder requirement where assignor "expressly agreed that it would not . . . assert any claim to any part of [its] debt . . . and it would not exercise any rights of a creditor in respect of the assigned debt").[17] Here, Sealink has not cited a single English case that would permit the assignors' dissolutions to be considered special circumstances and absolve Sealink from the joinder requirement, which the English Court of Appeal has held applies despite an assignor's dissolution. *See* Defs.' Memo. at 15 (citing *M.H. Smith (Plant Hire) Ltd v. Mainwaring* [1986] 2 BCC 99262, 99265). Not only has Sealink not cited any case that would permit the joinder requirement to be dispensed with in the circumstances here, but—to the contrary—the need to enforce this requirement is especially compelling here where Sealink seeks recovery of money damages but was not expressly assigned the right to sue and where other parties (the SPVs or some other entity altogether)[18] conceivably were assigned and could seek to enforce the right to sue over the MBS at issue. Sealink attacks the Court of Appeal's decision in *M.H. Smith* as "not accurately reflect[ing] the current state of English law on equitable assignments" but it has not cited any case that has questioned that decision, much less overruled it. Opp. at 21; *see* Auld Reply Decl. ¶ 17.

*Third*, Sealink argues that "English law does not require the [assignee's] interest to be 'pre-existing' for an equitable assignment," Opp. at 22, even though England's Court of Appeal explicitly requires an assignee's "clear *pre-existing*

---

[17] *See also* Onslow Reb. Decl. ¶ 23 Ex. 26 at 382 (citing *Raiffeisen Zentralbank Osterreich AG v. Five Star Trading LLC* [2001] QB 825 (CA) (joinder requirement not waived where assignor was defendant and therefore "all relevant parties [we]re before the court")).

[18] For example, Sealink's newly produced "Loan Agreement" identifies no fewer than ten German banks with some connection to the transactions between the SPVs and Sealink. *See* DeLange Decl. ¶ 2.B Ex. B at 614.

REPLY IN FURTHER SUPPORT OF THE COUNTRYWIDE DEFENDANTS' MOTION TO DISMISS

12

*interest* in the fruits of the action" based on the House of Lord's (*i.e.*, Supreme Court's) decision in *Trendtex Trading Corp. v. Credit Suisse* [1982] A.C. 679. *See* Defs.' Memo. at 15 (citing *Brownton Ltd v. Edward Moore Inbucon Ltd* [1985] 3 All E.R. 499, 509) (emphasis added); Auld Decl. ¶ 32. Sealink half-heartedly suggests in response to this authority that the pre-existing interest "was merely an *example* of a legitimate interest, rather than part of its *definition*." Opp. at 22 (emphasis in original). But Sealink cites no English case that says or suggests this, let alone a case that permitted a putative assignee to assert claims without *any* prior relationship to those claims.[19] Accordingly, Sealink's status "as the *present* owner" of the MBS (Onslow Decl. ¶ 26) is not a sufficient pre-existing interest giving rise to a valid equitable assignment.

## CONCLUSION

Because Sealink's "'standing does not adequately appear from all materials of record, the complaint must be dismissed.'" *Sealink*, 2012 WL 2250138, at *2 (quoting *Warth v. Seldin*, 422 U.S. 490, 501 (1975)). Dismissal should be with prejudice because any further amendment would be futile under English law.

---

[19] Onslow Reb. Decl. ¶ 33 n.13 Ex. 30 at 456-57 (citing *Tinseltime Ltd v. Roberts* [2011] EWHC 1199 (TCC) (finding December 2007 assignment valid where assignee's commercial interest in litigation began in August 2007)). As stated in the Auld Declaration and Auld Reply Declaration, *Massai Aviation Services v. Attorney General* [2007] UKPC 12, does not describe a pre-existing interest merely as an "example" of a legitimate interest, and is in any event an outlier and of limited precedential effect because it is a non-binding Privy Council decision construing Bahamian law. Auld Decl. ¶ 32 n.8; *see also* Auld Reply Decl. ¶ 20.

| | | |
|---|---|---|
| 1 | Dated: August 30, 2012 | Respectfully submitted, |
| 2 | | GOODWIN PROCTER LLP |
| 3 | | By: /s/ Brian E. Pastuszenski |
| 4 | | Brian E. Pastuszenski (*pro hac vice*)<br>Lloyd Winawer (State Bar No. 157823) |
| 5 | | John J. Falvey (*pro hac vice*)<br>Adam Slutsky (*pro hac vice*) |
| 6 | | *Counsel for the Countrywide Defendants* |
| 7 | | *Countrywide Financial Corporation,*<br>*Countrywide Home Loans, Inc., Countrywide* |
| 8 | | *Securities Corporation, CWALT, Inc.,*<br>*CWABS, Inc., and CWHEQ, Inc.* |

REPLY IN FURTHER SUPPORT OF THE COUNTRYWIDE DEFENDANTS' MOTION TO DISMISS

14