# EXHIBIT A-3

Neutral Citation Number: [2012] EWHC 2173 (Comm)

Case No: FOLIO 2012 433

**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**
**COMMERCIAL COURT**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 31/07/2012

Before :

**MR JUSTICE EDER**

Between :

| | |
|---|---|
| ASTON HILL FINANCIAL INC. (and others set out in the Claim Form) | **Claimants** |
| - and - | |
| AFRICAN MINERALS FINANCE LIMITED | **Defendant** |

Anthony Boswood QC and James Cutress (instructed by **Proskauer Rose LLP**) for the **Claimant**
Adrian Beltrami QC and Laura John (instructed by **Cleary Gottlieb Steen & Hamilton LLP**) for the **Defendant**

Hearing date: 22 June 2012

# Judgment

**Mr Justice Eder :**

*Introduction*

1. This judgment deals with the claimants' application and the defendant's cross application for summary judgment which turn on a short but difficult point of construction of a US$500m facility agreement dated 4 February 2011 (the "Facility") namely whether the claimants as lenders are entitled to recover from the defendant as borrower a 6% prepayment fee pursuant to Clause 8.8(d) of the Facility. Appendix 1 to this judgment contains relevant terms of the Facility but the focus of the argument turns upon Clauses 8.3, 8.5, 8.8(c) and 8.8(d).

*The dispute*

2. Clause 8.3 imposes an <u>obligation</u> to prepay in the following terms:

    "*8.3 Disposal Proceeds and Finance Proceeds*
    *(a) The Borrower shall prepay, and the Parent shall ensure that the Borrower prepays, the Loans in an amount equal to the amount of Disposal Proceeds or Finance Proceeds promptly upon receipt of any Disposal Proceeds or Finance Proceeds by any member of the Group..."*

    Clause 8.5 confers on the defendant the <u>right</u> voluntarily to prepay the whole or a certain part of the loan on giving the required notice. It states:

    "*8.5 Voluntary prepayment of the Loan*

    *The Borrower, if it gives the Facility Agent not less than five Business Days' (or such shorter period as the Majority Lenders may agree) prior notice, may prepay the whole or any part of the Loan (but, if in part, being an amount that reduces the Loan by a minimum amount of $100,000,000)."*

    Clause 8.8(c) requires any prepayment to be made together with (among other things) "*any prepayment fee required to be paid by the Borrower pursuant to this Clause 8.8.*" Clause 8.8(d) of the Facility then provides:

    "*(d) On prepayment of all or any part of the Loans pursuant to Clauses 8.5 (Voluntary prepayment of the Loan), the Borrower shall pay to the Facility Agent (for the account of each Lender) a prepayment fee on the date of such prepayment, in the following amount:*

    *(i) 6 per cent. of the amount prepaid or repaid if the prepayment is made on or before the first anniversary of the Closing Date; and*

    *(ii) thereafter no prepayment fee will be payable."*

    I should note in passing that the wording in Clause 8.8(d) appears to have a typographical error when it refers to "Clauses 8.5" (ie in the plural) but I did not

   understand that anything turned on this and I read the reference as being to Clause 8.5 in the singular.

3. In essence, it is the claimants' case that the defendant made a "voluntary prepayment" of the loan pursuant to Clause 8.5 of the Facility thereby rendering the defendant liable to pay the 6% prepayment fee (i.e. US$17,466,000) in accordance with Clause 8.8(d). The claimants now claim summary judgment in that amount plus interest and costs. There is no dispute that, as appears below, the defendant obtained refinancing from another source and prepaid the outstanding loan to the claimants. However, in essence, the defendant says that the prepayment was not a "voluntary payment" pursuant to Clause 8.5; that therefore Clause 8.8(d) was never triggered; and that accordingly no prepayment fee became payable. The defendant has itself issued its own summary judgment application in effect seeking a declaration of non-liability. It is common ground that both summary judgment applications should be determined at this stage. I should mention that there are also other applications by the claimants to add and to remove certain claimants and to make certain largely consequential amendments but these applications are not opposed.

4. In support of their application, the claimants have served a witness statement of Mr Crosby and also a short witness statement of Mr Irish in reply. The defendant has served a witness statement of Mr O'Neill.

*Factual Background*

5. So far as relevant, the background is as follows. The Facility relates to the development of phase 1 of the Tonkolili iron ore project in Sierra Leone. Under the Facility, the "Original Lenders" agreed to make available to the defendant a loan facility of up to $500m subject to the terms of the Facility.

6. On 10 February 2011, which was the Closing Date under the Facility, the "Original Lenders" advanced a total of US$417,700,000 to the defendant. A number of "Original Lenders" under the Facility subsequently assigned or novated their rights under the Facility. The precise details of such assignments/novations are not relevant for present purposes. It is sufficient to note that by the end of January 2012, the present claimants were lenders under the Facility in respect of loans totalling US$291,100,000, comprising loans of US$179,100,000 made in the capacity of "Original Lenders" and loans of US$112,000,000 acquired through novations and/or assignments in accordance with the Facility.

7. On 31 January 2012, the defendant's parent company African Minerals Limited ("AML") announced through the Regulatory News Service of the London Stock Exchange (RNS Number: 4578W) that Standard Bank Group Limited had confirmed that credit committee approval had been received for a refinancing package, which would be used to redeem the Facility in full prior to its first anniversary. In AML's preliminary results for the year ended 31 December 2011, the refinancing was described as a "maturation from high cost debt to low cost facilities". The terms of the refinancing are summarised in the accompanying accounts at note 22(2) which states such refinancing to be "on improved and less restrictive terms than the facilities that it has replaced."

8. On 3 February 2012, the defendant along with AML entered into a $417,700,000 facility agreement with the Standard Bank of South Africa Limited as mandated lead arranger ("the New Facility"). On the same day ie 3 February 2012, the defendant wrote to Wilmington Trust (London) Limited, which was by then the Facility Agent under the Facility, stating that as the defendant had recently announced, it intended to repay the Facility in full on 8 February 2012. The defendant noted that pursuant to Clause 8.3 of the Facility it was obliged to prepay the loans with any finance proceeds promptly after receipt of such funds and asked for detail as to (among other things) the amount required to prepay the Facility in full on a daily basis from 7 February 2012 to 9 February 2012 inclusive.

9. The Facility Agent replied by a letter of the same date, stating (among other things) the outstanding loan amount of $417,000,000 and details of the accrued interest but making clear that '*any other amounts that may be due under the Finance Documents are not included in this notice*'.

10. On the same day, the claimants' solicitors responded to the defendant's letter, notifying it that if the prepayment was made before 10 February 2012 (the first anniversary of the Closing Date), the defendant was required to pay the prepayment fee referenced in Clause 8.8(d) of the Facility. The letter went on to state that Clauses 8.3 and 8.5 of the Facility were not mutually exclusive and that, as the defendant was aware, prepayment fees were included to compensate the lenders for early repayment of the loan. The letter (i) noted that in this case, the lenders negotiated and agreed the prepayment fee with the defendant in order to ensure that they would be properly compensated for their costs of funds and risks incurred by virtue of entering into the Facility; (ii) stated that the defendant was seeking to obtain more favourable terms by refinancing the loans; and (iii) stated that the failure of the defendant to pay the prepayment fee in the event the Facility was prepaid on or before the first anniversary of the Closing Date would constitute a breach of a contract.

11. On 8 February 2012 the defendant prepaid the full amount outstanding under the Facility of US$417,700,000. Such prepayment included a prepayment of US$291,100,000 to the claimants in respect of the full principal amounts outstanding in respect of their loans to the defendant under the Facility.

*Principles of Construction*

12. The principles of construction are well established and were not in dispute. Both the claimants and the defendant sought to rely upon the passage in *Rainy Sky SA v. Kookmin Bank* [2011] 1 WLR 2900; [2011] UKSC 50 at [21] to [30]. Thus, it was common ground that it is necessary when construing a commercial contract to strive to attribute to it a meaning which accords with business common sense and to have an eye on the commercial consequences of a particular construction; and that: "*If there are two possible constructions, the court is entitled to prefer the construction which is consistent with business common sense and to reject the other*".

13. As to "factual matrix", it was also common ground that the applicable matrix of fact is that the claimants and the defendant are sophisticated commercial parties; that the Facility, for up to US$500 million, is a detailed commercial document setting out those rights and obligations that the parties agreed; and that the parties were represented by experienced law firms during the negotiation of the Facility which

took 3 months (the total legal fees paid to the lenders' six different sets of lawyers was around US$1.9 million).

*Summary of the claimants' case*

14. Mr Boswood QC accepted that the proceeds of the defendant's refinancing fell within the definition of *"Finance Proceeds"* (as defined in Clause 1.1) since these include the cash proceeds of any *"Financial Indebtedness"* which (as also defined in Clause 1.1) includes indebtedness in respect of *"moneys borrowed"*. He also accepted that Clause 8.3 required the defendant i.e. imposed an obligation on the defendant to use the proceeds of such refinancing to prepay the loan. This was because Clause 19.6 in effect prevented the defendant from incurring any *"Financial Indebtedness"* without the written consent of the lenders, unless (see Clause 19.6(b)(ii)) such indebtedness *"is to be applied on the date on which such Financial Indebtedness is incurred (or immediately thereafter) in prepayment or repayment of the Facility in full"*. In other words, the defendant was therefore entitled to borrow monies without the lenders' consent where such indebtedness was *"to be applied"* to prepay the Facility in full. In the context of a voluntary refinancing permitted by Clause 19.6(b)(ii), Clause 8.3 then ensures that the proceeds of such refinancing are in fact applied to prepay promptly the loan. However, Mr Boswood QC submitted that the existence of such obligation under Clause 8.3 does not prevent the prepayment also from constituting a voluntary prepayment falling with Clause 8.5; and that in this respect, Clause 8.3 stands alongside but does not displace or disapply Clause 8.5.

15. Mr Boswood QC submitted that in contrast the defendant's construction would have the effect of relieving it of any obligation to pay any prepayment fee in circumstances in which it voluntarily refinanced for the purpose of repaying the Facility in full; and that this is a highly uncommercial result, which cannot have been intended and which the court should reject in the light of *Rainy Sky*. In particular, Mr Boswood QC relied on the following points. First, according to the defendant's own evidence, the African Minerals Group had insufficient cash, cash equivalents and trade and other receivables to repay the loan under the Facility. If the prepayment fee was not payable in circumstances in which the defendant voluntarily chose to refinance, then it is difficult to see in what circumstances it would ever have been payable. Second, even if (contrary to the above) the defendant was able to repay the loan out of its own funds, no explanation has been provided as to any commercial rationale for drawing a distinction between such a prepayment (which would trigger the prepayment fee) and a prepayment upon a refinancing (which would not). The rationale for having a prepayment fee applies to both, since the purpose of a prepayment fee is to compensate for the cost of funds and/or loss of future payments. Third, the defendant's construction has all the hallmarks of being thought up by lawyers after the event. In this respect, it is notable that the financial statements attached to AML's own preliminary results for the year ended 31 December 2011 refer in unqualified terms to the principal terms of the Facility including *"Repayment by the Company at any time (repayments during the first year incur a prepayment fee being 6% of the amount repaid)."*

*Summary of the defendant's case*

16. The defendant's case is, in essence, that (i) the only available construction of the Facility is that the prepayment fee was not due; alternatively (ii) this is the

construction which is most consistent with commercial and common sense and therefore should be accepted by the court in the light of *Rainy Sky*. As to his primary case, Mr Beltrami QC submitted, in summary, that there is no ambiguity in the Facility viz.

    i)    By Clause 8.8(d), and unambiguously, a prepayment fee becomes due only if and to the extent that a prepayment is made *"pursuant to Clauses 8.5..."*

    ii)    As confirmed in Clause 8.8(c), a prepayment *"shall otherwise be made without premium or penalty."*

    iii)    The prepayment in the present case was made pursuant to Clause 8.3 and was in the circumstances mandatory.

    iv)    The prepayment was <u>not</u> in fact made pursuant to Clause 8.5. This clause is a procedural clause which sets out a specific regime under which, with notice, a borrower may exercise a right to prepay, without compulsion. The defendant did not purport to, was not required to, and did not in fact exercise that right, follow that procedure or provide the specified notice.

    v)    In any event, Clauses 8.3 and 8.5 are mutually exclusive.

17.    In support of the argument that the prepayment did not fall within Clause 8.5, Mr Beltrami QC relied on seven main points.

18.    First, he submitted that as a matter of fact, it did not; and that the notice provisions were not insisted on, adhered to, or waived. In particular, he submitted that the contractually prescribed notice procedure in Clause 8.5 is important for a prepayment made pursuant to that clause because without it the Borrower has no right to prepayment at all; and that sub-Clause 8.8(f) emphasises the importance of compliance with respect to any re/prepayment: *"The Borrower shall not repay or prepay all or any part of the Loan or cancel all or any part of the Commitments except at the times and in the manner expressly provided for in this Agreement"*.

19.    Second, Mr Beltrami QC submitted that, in any event, the claimants' contention fails on analysis; that this clause is, on its fair and proper reading, a procedural clause by which the defendant is given the right to make a payment, upon the satisfaction of the stated conditions; that that is all that it does; and that it is <u>not</u> a clause which seeks to characterise as "voluntary", or bring within its embrace, any prepayment which has a non-compulsory background. In that context, Mr Beltrami QC submitted that (i) there would be no reason for such a clause; (ii) it is not what the clause does or purports to do; and (iii) Clause 8.5 does not even use the word "voluntary": the word appears only in the heading, and is accordingly not even part of the construction (see Clause 1.2(b)).

20.    Third, Mr Beltrami QC submitted that the claimants' case is one which is so redolent of ambiguity that it cannot accord with any commercial or common sense. Thus, he asked rhetorically: At what level of abstraction are the parties to determine whether a payment deserves the epithet "voluntary"? Do the parties look to the payment itself or to the underlying circumstances which led (directly or indirectly) to the payment? Whose compulsion is to be taken into account? And what is the relevant standard of

compulsion (legal, economic or otherwise) by which this is to be judged? This is not, argued Mr Beltrami QC, the basis of a commercial agreement of loan between sophisticated parties.

21. Fourth, Mr Beltrami QC submitted that the basis of the claimants' case i.e. that Clauses 8.3 and 8.5 are not mutually exclusive is unsupportable and plainly wrong. In particular, he submitted that in their language and in their context, these two sub-Clauses are drafted in a mutually exclusive way viz.

   i) The language of sub-Clause 8.3 is mandatory or compulsory language ("*shall*"), whereas the language of sub-Clause 8.5 is voluntary ("*may*").

   ii) Sub-Clause 8.3 imposes obligations on both the defendant and its parent company, whereas sub-Clause 8.5 confers a right of prepayment on the defendant if certain conditions are met. The concept of an obligation to pay is logically distinct from (indeed, the opposite of) the concept of a procedurally prescribed right to pay.

   iii) Sub-Clause 8.5 provides for a notice period of no less than 5 days, whereas sub-Clause 8.3 imposes the requirement that payment shall be made promptly upon receipt, and with no notification requirements.

   iv) Sub-Clause 8.6 treats the preceding sub-Clauses as distinct, separate Clauses.

   v) Sub-Clause 8.8(a) precludes a voluntary partial repayment under Clause 8.5 prior to Project Completion but does not preclude a mandatory partial repayment under cl 8.3. This is, again, consistent only with mutual exclusivity.

   vi) The sub-Clauses of Clause 8 also provide for different outcomes and are therefore mutually exclusive. For example, sub-Clause 8.2 (change of control and management event – either of which might well be "voluntary") provides for prepayment of 110% of the principal amount, whereas Clause 8.5 provides for prepayment of 100% of the whole or any part of the loan.

   vii) That these Clauses are mutually exclusive for the purpose of any prepayment fee is confirmed by the terms of Clause 8.8. Pursuant to Clause 8.8(d), a prepayment made "*pursuant*" to Clause 8.5 engages a fee. Pursuant to Clause 8.8(c), any other payment (ie any payment pursuant to any other Clause) is made "*without premium or penalty*". Thus the clauses must be mutually exclusive for these purposes.

22. Fifth, Mr Beltrami QC submitted that if not otherwise apparent by the language used, the claimants' outcome is one which cannot be supported by commercial and common sense and the inevitable result of their construction is that the same payment can fall under at least two different sub-Clauses of Clause 8: yet the Facility contains no provision for the solution of the conflict which would then arise (eg as to whether a prepayment fee is due, or what amount of principal is due). Thus, Mr Beltrami QC submitted that it cannot be imagined that commercial parties, with the benefit of the advice they had, would have exposed themselves to such a level of inconsistency and uncertainty.

23. Sixth, Mr Beltrami QC submitted that the claimants' case that Clause 8.8 is, in effect, intended to impose a prepayment fee in respect of "voluntary" prepayments is "impossible" for three further reasons viz

   i) First, it is not what the clause provides. What the clause says is that the fee arises only if a prepayment is made pursuant to Clause 8.5. It is to be inferred that the other sub-Clauses of Clause 8 which are not expressly referenced in Clause 8.8 were deliberately omitted.

   ii) Second, the clause is in any event drafted in a way inconsistent with the claimants' case. Specifically, it is drafted by reference to clauses, not concepts. In order to accommodate the claimants' case, Clause 8.8 would not and could not have been drafted in the way that it has. Instead, Clause 8.8(d) would extend generally to all payments under Clauses 8.1, 8.2, 8.3 and 8.5, provided such payments were in some relevant sense "voluntary". Of course, had the clause been drafted in such a way, the agreement would have had to specify what was meant by "voluntary". The absence of such specifics underscores just how far the claimants need to move from the agreement.

   iii) The consequence of the claimants' construction would be to introduce an ambiguity, indeed an irreconcilable ambiguity, in the Facility. What happens, on the claimants' case, when a prepayment falls under more than one clause? Do the claimants choose which clause they wish to rely upon? Or does the defendant choose? Or is there some other, and if so what, means of reconciliation? The point can be tested with a payment under Clause 8.3 which the claimants seek to characterise as "voluntary" under Clause 8.5. Does that characterisation mean that the defendant is free from the obligations imposed upon it under Clause 8.3 (and if so, why should Clause 8.5 "trump" Clause 8.3)? Or is the prepayment to be treated as both mandatory and voluntary, in any way that is favourable to the claimants? There is no reason for such an illogical approach. This conflict is even more acute under Clause 8.2, which envisages a mandatory prepayment following a Management Event which the claimants might characterise as "voluntary". If it is a payment under Clause 8.2, there is an obligation to pay 110% of principal, without prepayment fee. But if it is a payment under Clause 8.5, the obligation is to pay 100% of principal but with a prepayment fee. If Clause 8.8 were to be interpreted so as to impose a fee for all "voluntary" prepayments, these provisions could not be reconciled.

24. Seventh, the claimants' construction gives rise to an anomaly or at least does not fit easily with Clause 19.14(b)(i) which, in effect, permits the issuance of *"any stock, share, debenture or other securities"* provided that it is made by the *"Parent"* and that the proceeds of such issuance are applied in prepayment of the loan in accordance with Clause 8.3. It would be odd that in circumstances where, for example, the stock so issued pursuant to Clause 19.14(b)(i) and part of the loan prepaid was more than US$100m the defendant was obliged to pay the prepayment fee payable but that no prepayment fee was payable where the amount of such stock issued and the loan prepaid was less than US$100m.

*Discussion*

25. These arguments are finely balanced and I confess that I have wavered on the point. This is so because the wording is far from clear and the arguments in relation to business common sense do not point clearly in one direction.

26. Perhaps unusually, it is convenient to consider at the outset the various arguments with regard to business common sense since this played a large part in the submissions made by both Mr Boswood QC and Mr Beltrami QC.

27. First, as appears above, although there is no doubt that when construing a commercial contract the court should strive to attribute to it a meaning which accords with business common sense, it is not always easy for the court to identify which of two possible constructions is more consistent with business common sense particularly where, as in the present case, each side trumpets that its own construction is plainly the more consistent.

28. Second, it seems to me that one of the possible difficulties with Mr Beltrami QC's argument from a business common sense point of view is that it would seem to permit the defendant, in certain circumstances at least, deliberately to adopt a course of action which would have the effect of evading having to pay the prepayment fee. Take, for example, a situation where the defendant has generated sufficient funds to pay off the outstanding loan under the Facility. Mr Beltrami QC accepts that if the defendant uses those funds to prepay the loan, it would have to pay the prepayment fee pursuant to Clause 8.8(d). However, if Mr Beltrami QC's construction is right, the defendant would seemingly be able to avoid such prepayment fee by obtaining outside funding from a third party (which it could do without the consent of the Facility Agent pursuant to Clause 19.6(ii)(b)), using such funds to prepay the loan under the Facility (which the defendant would in fact be obliged to do under Clause 8.3) and then using its own funds to pay back the third party. The existence of the possibility of such scheme to avoid the prepayment fee that would otherwise be payable would seem to support Mr Boswood QC's arguments that the defendant's case potentially leads to a result which is uncommercial from a business point of view although it is perhaps uncertain whether the scheme identified above would be workable in practice.

29. Third, the structure of the Facility with regard in particular to the imposition of a prepayment fee strikes me, on any view, as somewhat odd from a business point of view. In particular, ignoring for present purposes the precise wording of the present Facility and putting on one side whether the particular prepayment here is to be characterised as one made "pursuant to" Clause 8.5, it seems to me somewhat odd that the lender's entitlement to receive a prepayment fee should depend upon the circumstances in which the borrower comes to make the prepayment. From a business point of view, one can, I think, legitimately ask: why should this matter ? One might suppose that in circumstances where the lender agrees to provide funding for a certain period, the reason for any prepayment is, at least so far as the lender is concerned, irrelevant from a business point of view. All that matters to the lender is that it is receiving the prepayment earlier than otherwise; and, if that is right, it is not easy to understand why, from a business common sense point of view, Clause 8.8(d) is structured such that the lender should receive a prepayment fee in one instance (ie when there is a voluntary prepayment) but not in some other instance (ie when there is no voluntary prepayment). Neither Mr Boswood QC nor Mr Beltrami QC had any satisfactory answer to this conundrum. One possible answer from a business point of view is that if a borrower is "forced" (ie contractually obliged) to make a prepayment

it would be "unfair" to require the borrower to pay a prepayment fee; but that there is no such "unfairness" where the borrower decides for its own commercial interests to refinance "voluntarily" and to pay off the existing Facility from such refinancing. This is the argument which underlies much of the case advanced by Mr Boswood QC ie the defendant's construction would have the effect of relieving it of any obligation to pay any prepayment fee in circumstances in which it voluntarily refinanced for the purpose of repaying the Facility pursuant to Clause 8.5. However, it seems to me that, as Mr Beltrami QC submitted, such argument begs a number of questions as to what is meant by "voluntarily"; it is arguably inconsistent, or at least does not fit easily, with the language employed by the parties; and one possible view (strongly urged by Mr Beltrami QC) is that the commercial purpose of Clause 8.8(d) is, in effect, to impose an obligation to pay the prepayment fee when (and only when) the defendant has done so well that it has generated sufficient of its own funds to prepay the whole amount of the existing loan or at least the minimum amount stipulated in Clause 8.5.

30. Fourth, as Mr Beltrami QC accepted, if the defendant's construction were correct, the only situation in which the prepayment fee would become payable is where the defendant prepaid a minimum amount of $100m of the loan out of its own funds within the first anniversary of the Closing Date. Relying upon that concession, Mr Boswood QC submitted that this demonstrated that the defendant's construction was obviously wrong because, viewed as at the date when the parties agreed and signed the Facility, it was "inconceivable" alternatively "highly unlikely" alternatively "unlikely" that the defendant might have been able to make such prepayment of such amount (let alone the full amount) out of its own funds within such period. As Mr Boswood QC asked rhetorically: How on earth was this fledgling mining company going to generate such funds to be able to make such prepayment out of such funds within such a short period of time ? I was initially impressed with that argument and I am prepared to accept for present purposes that the unlikelihood of the defendant being able to generate such funds within such period would be part of the "factual matrix" and admissible as an aid to construction. However, there was nothing in the evidence to support the assertions made by Mr Boswood QC in this regard; and, absent such evidence, it seems to me impossible to make the necessary inference which is the foundation of Mr Boswood's QC's argument.

31. For all these reasons, I have found the plea by both sides that I should construe the Facility in accordance with business common sense difficult to apply in the particular circumstances of the present case. The arguments fly in different directions or at least are not clear-cut. In such circumstances, I think there is considerable difficulty – and potential danger – in the court relying upon such arguments in reaching its conclusion. Nor do I consider that it is permissible to have regard to what is said with regard to prepayments in AML's own preliminary results quoted above and relied upon by Mr Boswood QC. Quite apart from the fact that such unqualified statement is, in my view, obviously wrong, it seems to me to be inadmissible as an aid to construction on well-established principles.

32. So I turn to consider the wording of the relevant Clauses of the Facility. As to this, I am unpersuaded by Mr Beltrami QC's submission that the fact that Clause 1.2(b) provides that *"Clause and Schedule headings are for ease of reference only"* means that I should, in effect, ignore the word "voluntary" in the heading of Clause 8.5 given

that Clause 8.8(d) itself uses that word in the body of the clause. I am also unpersuaded by Mr Beltrami QC's argument that the prepayment cannot be regarded as a payment made pursuant to Clause 8.5 because of the absence of any prior notice by the defendant. On balance, it seems to me that that is a procedural requirement in the claimants' favour and that it is open for the claimants not to insist upon such requirement.

33. However, the other arguments advanced by Mr Beltrami QC do persuade me that, as a matter of construction, there is no obligation to pay the prepayment fee in the circumstances of the present case. The main counter-argument advanced by Mr Boswood QC that Clause 8.3 stands "alongside" Clause 8.5 is superficially attractive. So too was Mr Boswood QC's attempt to define those prepayments which were properly to be regarded as "voluntary" for the purposes of Clause 8.5 when he stated that: any prepayment is voluntary which the payer is not obliged to make by any other provisions of the Facility. However, in my judgment, the main fallacy in the claimants' argument is the failure to distinguish between, on the one hand, the refinancing, and, on the other hand, the prepayment. I agree with Mr Beltrami QC that there are, or at least may be, difficulties in characterising what conduct is or is not "voluntary" but I am content to assume here that the refinancing carried out by the defendant is properly to be characterised as "voluntary". However, as Mr Boswood QC conceded, the proceeds of such refinancing fell within the definition of "Finance Proceeds" and accordingly the defendant thereby came under an obligation to prepay the loan by virtue of Clause 8.3. In other words, although the refinancing was "voluntary", the prepayment was not.

34. I find it impossible to say that because the purpose or object of the refinancing was to pay the prepayment and, more specifically, the refinancing was permissible by virtue of the fact that it fell with Clause 19.6(b)(ii), the prepayment was therefore voluntary and made pursuant to Clause 8.5 within the meaning of Clause 8.8(d). Given Mr Boswood QC's concession, it seems to me that the refinancing provided the defendant with a new source of *"moneys borrowed"* which, upon receipt, triggered the defendant's obligation to prepay the loan under Clause 8.3. I cannot see a proper basis for distinguishing between moneys borrowed for the specific purpose of making a prepayment and moneys borrowed generally. I recognise, of course, that pursuant to Clause 19.6(b)(ii) and as was common ground, there was no obligation on the defendant here to obtain the written consent of the Facility Agent to incur the further Financial Indebtedness because such further Financial Indebtedness was to be applied in prepayment of the Facility in full. However, it does not seem to me that this affects the operation of Clause 8.3.

35. I should emphasise that I remain very uncertain whether this conclusion accords with business common sense. As noted above, it was Mr Boswood QC's submission that it did not. However, for reasons stated above, I found the arguments in relation to what was supposedly business common sense difficult to apply and whatever such arguments may be, the conclusion which I have reached is one which, in my judgment, is more consistent with the language used in the Facility.

36. Accordingly, it is my conclusion that the claimants are not entitled to a prepayment fee. Therefore, I dismiss the claimants' application for summary judgment and uphold the defendant's application for summary judgment. Counsel are requested to seek to

agree a draft order for approval. Failing agreement, I will deal with any outstanding issues.

## Appendix 1

## EXTRACTS FROM FACILITY AGREEMENT DATED 4 FEBRUARY 2011

1. **Definitions and Interpretation**

   1.1 Definitions

   In each Finance Document:

   ............

   "**Finance Proceeds**" means the cash proceeds of any equity issuance received or Financial Indebtedness incurred by any member of the Group (including any amount receivable in repayment of intercompany debt) except for Excluded Finance Proceeds and after deducting any reasonable expenses that are incurred by any member of the Group with respect to such equity issuance or Financial Indebtedness to persons who are not members of the Group.

   "**Financial Indebtedness**" means any indebtedness for or in respect of:

   (a) moneys borrowed;

   ..................................

   1.2 (b) Clause and Schedule headings are for ease of reference only

   ............................

7. **REPAYMENT**

   7.1 Repayment of Instalments

   (a) The Borrower shall repay the Loan in instalments by repaying an amount equal to 10 per cent. of the Total Commitments on each Repayment Date.

   (b) On the Final Maturity Date, the Borrower shall pay and discharge all Secured Obligations in full.

   ..................................

8. **PREPAYMENT**

   8.1 Illegality

If it becomes unlawful in any applicable jurisdiction for a Lender to perform any of its obligations as contemplated by this Agreement or to fund or maintain its participation in any Loan:

(a) that Lender promptly shall notify the Facility Agent upon becoming aware of that event;

(b) upon the Facility Agent notifying the Parent, the Commitment of that Lender shall be cancelled immediately; and

(c) the Borrower shall repay that Lender's participation in the Loan on the first Interest Payment Date falling after the Facility Agent has notified the Parent or, if earlier, the date specified by the Lender in the notice delivered to the Facility Agent (being no earlier than the last day of any applicable grace period permitted by law).

8.2 Change of control and Management Event

(a) If:

(i) any person or group of persons acting in concert gains control of the Parent (a "Change of Control"); or

(ii) a Management Event occurs;

the Parent promptly shall notify the Facility Agent upon becoming aware of that event, whereupon:

(A) the Facility shall be cancelled and all outstanding amounts shall become due and payable by the Borrower immediately, in the case of a Management Event, or within 30 days of the date on which the Change of Control occurs, as the case may be; and

(B) the Borrower shall prepay (and the Parent shall ensure that the Borrower prepays) the Loan, which, in the case of a Change of Control, shall be in an amount equal to 110 per cent. of the principal amount thereof.

...............................................

8.3 Disposal Proceeds and Finance Proceeds

(a) The Borrower shall prepay, and the Parent shall ensure that the Borrower prepays, the Loans in an amount equal to the amount of Disposal Proceeds or Finance Proceeds promptly upon receipt of any Disposal Proceeds or Finance Proceeds by any member of the Group.

..................................................

8.5   Voluntary prepayment of the Loan

The Borrower, if it gives the Facility Agent not less than five Business Days' (or such shorter period as the Majority Lenders may agree) prior notice, may prepay the whole or any part of the Loan (but, if in part, being an amount that reduces the Loan by a minimum amount of $100,000,000).

..................................................

8.7   Right of repayment and cancellation in relation to a single Lender

(a)   If:

(i)   any sum payable to any Lender by an Obligor is required to be increased under Clause 11.2(c) (Tax gross-up); or

(ii)   any Lender claims indemnification under Clause 11.3 (Tax indemnity) or Clause 12.1 (Increased costs);

the Parent may, whilst the circumstance giving rise to the requirement for that increase or indemnification continues give the Facility Agent notice of cancellation of the Commitment of that Lender and its intention to procure the repayment of that Lender's participation in the Loans.

..................................................

8.8   Conditions to repayment and prepayment

(a)   The Borrower may not exercise its right of voluntary prepayment in respect of a partial prepayment of the Facility under Clauses 8.5 (Voluntary prepayment of the Loan) or 8.7 (Right of repayment and cancellation in relation to a single Lender) prior to Project Completion unless the Parent has delivered to the Facility Agent a certificate from a director of the Parent that confirms that the board of directors of the Parent is satisfied that, after the proposed prepayment, the Borrower shall have adequate funding to achieve Project Completion and to discharge its actual or contingent obligations under the Project Documents.

(b)   Any notice of cancellation or prepayment given by any Party under this Clause 8 (Prepayment) shall be irrevocable and, unless a contrary indication appears in this Agreement, shall specify the date or dates upon which the relevant cancellation or prepayment is to be made and the amount of that cancellation or prepayment.

..................................................

(d) On prepayment of all or any part of the Loans pursuant to Clauses 8.5 (Voluntary prepayment of the Loan), the Borrower shall pay to the Facility Agent (for the account of each Lender) a prepayment fee on the date of such prepayment, in the following amount:

    (i)    6 per cent. of the amount prepaid or repaid if the prepayment is made on or before the first anniversary of the Closing Date; and

    (ii)    thereafter, no prepayment fee will be payable.

..........................................................

10.4    Other payments

The Borrower shall pay to the Facility Agent and to the Security Trustee (each for its own account) an additional payment in the amount and at the times agreed in a Fee Letter with the Facility Agent and with the Security Trustee, respectively.

..........................................................

19.    General Undertakings

The undertakings in this Clause 19 remain in force from the date of this Agreement for so long as any amount of the Secured Obligations is outstanding or any Commitment is in force.

..........................................................

19.4    Disposals

    (a)    No Obligor shall (and the Parent shall ensure that no other member of the Group will) effect a Disposal of any of its assets, undertaking or business without the prior written consent of the Facility Agent (acting on the instructions of the Majority Lenders).

    (b)    Clause 19.4(a) does not apply to any Disposal (in respect of which fair value consideration is received by the disposing entity):

        (i)    made in the ordinary course of trading of the disposing entity;

        ..........................................

provided that: (A) if the proceeds of any such Disposal received by any Obligor (other than in respect of a Disposal that is necessary for the completion or consummation of a Permitted Transaction) are non-cash assets, the relevant Obligor, at its own expense, shall grant (and the Parent shall procure that such Obligor grants) to the Security Trustee (for the benefit of the Finance Parties) as soon as reasonably practicable a first ranking Security in respect of such

Obligor's right, title, interest and benefit in such non-cash asset; and (B) for the avoidance of doubt, any Disposal Proceeds shall be applied in prepayment of the Loan pursuant to and in accordance with Clause 8.3 (Disposal Proceeds and Finance Proceeds).

...........................................................

19.6 Financial Indebtedness

(a) No Obligor shall (and the Parent shall ensure that no other member of the Group will) without the prior written consent of the Facility Agent (acting on the instructions of the Majority Lenders):

1. incur or have outstanding any Financial Indebtedness to any other person; and

2. pay or discharge (including by way of set-off or combination of accounts), or grant any guarantee, indemnity, bond, letter of credit or similar assurance against financial loss in support of, any indebtedness owed by it or any other person,

provided that, for the avoidance of doubt, commitment fees payable by any Obligor to any other Obligor in respect of committed but undrawn indebtedness shall not for the purpose of this Clause 19.6 (Financial Indebtedness) constitute Financial Indebtedness unless such amounts are not paid when due.

(b) Clause 19.6(a) does not apply to any Financial Indebtedness owed by or to any member of the Group:

(i) under or permitted by a Finance Document;

(ii) that is to be applied on the date on which such Financial Indebtedness is incurred (or immediately thereafter) in prepayment or repayment of the Facility in full;

...........................................................

19.14 Share capital

(a) No Obligor shall:

(i) redeem, repurchase, defease, retire or repay any of its share capital, or resolve to do so;

(ii) issue any stock, share, debenture or other securities to any person; or

       (iii)    subscribe for or otherwise acquire any stock or share that is only partly paid up or in respect of which the company that issued that stock or share has any call or lien.

(b)    Clause 19.14(a) does not apply to any issue of stock, shares, debentures or other securities:

       (i)    made by the Parent, provided that the proceeds of such issuance are applied in prepayment of the Loan in accordance with Clause 8.3 (Disposal Proceeds and Finance Proceeds);